OPINION
{¶ 1} Defendant-appellant, Ramone Barnett, appeals from a Jefferson County Common Pleas Court judgment convicting him of possession of drugs, having a weapon while under disability, and receiving stolen property following a jury trial, and the sentence that followed.
 {¶ 2} Based on information gained from an ongoing investigation, Steubenville Police obtained a search warrant for 448 South Fifth Street, the apartment of Marcie Mitchell. Mitchell is the mother of appellant's three children. At the time, appellant moved back and forth between Mitchell's house and his home in Detroit. Both appellant and Mitchell were at the residence when officers showed up with the warrant.
 {¶ 3} Upon searching the apartment, officers found, among other things, a loaded 9mm firearm in a kitchen cupboard. Since appellant was a convicted felon, he was unable to possess a firearm. The officers arrested him for possessing a firearm while under a disability.
 {¶ 4} While appellant was outside, he requested his jacket. Inside his jacket pocket were the keys to a maroon Ford Windstar van. After appellant was taken to jail, a drug dog sniffed the maroon van along with another van that was parked in the driveway. Based on the dog's indication, the officers obtained another warrant, this time to search the vans. The subsequent search turned up 34 grams of crack cocaine wrapped in 12 packages on the floor of the maroon van. Also located inside the maroon van were several of appellant's belongings including his golf clubs, bowling ball bag, and hat.
 {¶ 5} A later investigation into the gun found in the kitchen cupboard revealed that it had been stolen from a home in West Virginia.
 {¶ 6} On March 1, 2006, a Jefferson County grand jury indicted appellant on one count of possession of crack cocaine in excess of 25 grams, a first-degree felony in violation of R.C. 2925.11(A)(C)(4)(e), one count of possession of a firearm while under disability, a third-degree felony in violation of R.C. 2923.13(A)(3), and receiving stolen property, a fourth-degree felony in violation of R.C. 2913.51(A). *Page 2 
 {¶ 7} The case proceeded to a jury trial and the jury found appellant guilty as charged. The court later held a sentencing hearing. It sentenced appellant to ten years for possession of drugs, five years for having a weapon under disability, and 18 months for receiving stolen property. It ordered that appellant serve his sentences consecutively for a total of 16-and-a-half years in prison. The court also ordered that appellant forfeit his interest in the maroon mini van and $416 in cash.
 {¶ 8} Appellant filed a timely notice of appeal on June 13, 2006.
 {¶ 9} Appellant's counsel in this matter has filed a brief containing "non assignments of error." This brief is similar to a no-merit brief pursuant to State v. Toney (1970), 23 Ohio App.2d 203, 262 N.E.2d 419. However, in this case, unlike in a Toney situation, appellant's counsel has not requested to withdraw from this case and has actually analyzed several issues that could be raised on appeal (admission of the seized evidence, sufficiency of the evidence, manifest weight of the evidence, and ineffective assistance of counsel) and concluded that they have no merit. After receiving this brief, we granted appellant permission to file a pro se brief, which he did. Appellant now raises four assignments of error in his pro se brief.
 {¶ 10} Although not technically a Toney brief, the practical effect of appellant's counsel's brief is the same as if it were a Toney brief. Therefore, we will apply the procedure set out in Toney where it is the duty of the Court of Appeals to fully examine the proceedings in the trial court, the brief of counsel, the arguments pro se, and then determine whether or not the appeal is frivolous.
 {¶ 11} Appellant's pro se assignments of error basically coordinate with his counsel's non-assignments of error. Thus, in reviewing this case, we will consider the issues raised in counsel's non-assignments of error in conjunction with appellant's assignments of error.
 {¶ 12} Appellant's first pro se assignment of error states:
 {¶ 13} "TRIAL COURT ERRED BY SENTENCING APPELLANT [TO] MAXIMUM CONSECUTIVE SENTENCES IN VIOLATION OF THE 8TH AND 14TH AMENDMENT[S] OF THE U.S. CONSTITUTION, AND O.R.C. STATUTE *Page 3 
2929.11(B), 2929.14(C), AND 2929.14(E)(4)."
 {¶ 14} Appellant argues here that the court should not have imposed maximum, consecutive sentences on him.
 {¶ 15} Appellant first argues that there was no evidence presented at trial to establish that the firearm seized from him was operable. Therefore, he argues that he should not have been convicted of felony receiving stolen property, but instead should have only been convicted of misdemeanor receiving stolen property. Thus, his argument seems to be that the court should not have sentenced him for a fourth-degree felony, but instead should have sentenced him as if he had been convicted of a misdemeanor.
 {¶ 16} Appellant next argues that his maximum sentence for having a weapon while under disability violates R.C. 2929.11(B), which provides: "A sentence imposed for a felony shall be reasonably calculated to achieve the two overriding purposes of felony sentencing set forth in division (A) of this section, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders." Appellant contends that because this crime was "victimless" he should have received a shorter sentence. Additionally, he asserts that his sentence for this offense is not consistent with other sentences imposed on similar offenders. Appellant cites to several cases where offenders convicted of having a weapon while under disability received lesser sentences.
 {¶ 17} Appellant next argues that the trial court should not have sentenced him to a maximum term for possession of crack cocaine. He points out that for felony one possession of crack cocaine the minimum amount of crack cocaine possessed is 25 grams and the maximum is 100 grams. Because he was convicted of possessing 34 grams of crack cocaine, appellant argues that his sentence should be at the lower end of the sentencing spectrum. He believes that the maximum sentence is only meant for offenders who possessed 100 grams. Again, appellant cites to several cases where offenders convicted of similar crimes were given non-maximum *Page 4 
sentences.
 {¶ 18} Finally, appellant argues that the trial court should not have ordered that he serve his sentences consecutively because his crimes were victimless, he poses no danger to the public, and the sentences are disproportionate to his conduct.
 {¶ 19} The sentencing court has discretion to impose any sentence within the statutory sentencing range. State v. Foster,109 Ohio St.3d 1, 845 N.E.2d 470, 2006-Ohio-856, at ¶ 100. The court is free to consider any factors it finds relevant. State v. Moore, 7th Dist. No. 06-MA-60, 2007-Ohio-1574, at ¶ 9, citing R.C. 2929.11 (setting forth the overriding purposes of felony sentencing); R.C. 2929.12 (listing the factors to consider in felony sentencing and allowing the court to consider any other factor the court finds relevant); Foster,109 Ohio St.3d 1. Furthermore, "trial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." Id. at ¶ 100.
 {¶ 20} In this case, the court found highly relevant the fact that appellant was a repeat offender who had already served three prison terms. (Tr. 790). For this reason, the court determined that maximum, consecutive sentences were necessary. (Tr. 790-91).
 {¶ 21} The trial court sentenced appellant to ten years for possession of crack cocaine, a first-degree felony, five years for having a weapon while under a disability, a third-degree felony, and 18 months for receiving stolen property, a fourth-degree felony. The possible prison sentences for a first-degree felony are three, four, five, six, seven, eight, nine, or ten years. R.C. 2929.14(A)(1). The possible prison sentences for a third-degree felony are one, two, three, four, or five years. R.C. 2929.14(A)(3). And the possible prison sentences for a fourth-degree felony are six, seven, eight, nine, ten, eleven, twelve, thirteen, fourteen, fifteen, sixteen, seventeen, or eighteen months. R.C. 2929.14(A)(4). Thus, all of appellant's sentences were within the statutory ranges. *Page 5 
 {¶ 22} Additionally, this court has observed: "Although crimes may be `similar' in the sense of being based on the same statutory provision, they may not be similar in how they were carried out. Furthermore, two defendants may be similar in some respects, such as being in the same place and using the same weapons to commit a crime, but be very dissimilar in other respects [such as in their history of prior felony convictions and prison terms]." State v. Johnson, 7th Dist. No. 04-MA-193, 2007-Ohio-3332, at ¶ 48. Thus, simply because other defendants who were convicted of similar crimes did not receive maximum sentences does not lead to the conclusion that appellant's maximum sentences are improper.
 {¶ 23} Accordingly, appellant's first assignment of error is without merit.
 {¶ 24} Appellant's second pro se assignment of error states:
 {¶ 25} "COUNSEL WAS INEFFECTIVE BY FAILING TO FILE A MOTION TO SUPPRESS THE DRUGS AND THE GUN OR AT LEST [sic.] PROOFFERING [sic.] THE ISSUE FOR APPEAL."
 {¶ 26} In addition, counsel's first non-assignment of error states:
 {¶ 27} "THE TRIAL COURT DID NOT COMMIT PLAIN ERROR WHEN IT ADMITTED ALL OF THE ITEMS SEIZED FROM THE RESIDENCE AT 448 SOUTH FIFTH STREET, STEUBENVILLE, OHIO."
 {¶ 28} Here appellant claims that his counsel was ineffective because (1) she failed to make a proffer to the trial court regarding the search warrant and (2) she should have filed a motion to suppress the evidence seized during the raid because the search warrant was not supported by probable cause and because the drug dog that sniffed the van containing the drugs was unreliable.
 {¶ 29} To prove an allegation of ineffective assistance of counsel, the appellant must satisfy a two-prong test. First, appellant must establish that counsel's performance has fallen below an objective standard of reasonable representation. Strickland v. Washington (1984),466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; State v. Bradley
(1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. Second, appellant must demonstrate that he was prejudiced by *Page 6 
counsel's performance. Id. To show that he has been prejudiced by counsel's deficient performance, appellant must prove that, but for counsel's errors, the result of the trial would have been different.Bradley, 42 Ohio St.3d at paragraph three of the syllabus.
 {¶ 30} Appellant bears the burden of proof on the issue of counsel's effectiveness. State v. Calhoun (1999), 86 Ohio St.3d 279, 289,714 N.E.2d 905. In Ohio, a licensed attorney is presumed competent. Id.
 {¶ 31} In this case, appellant's counsel did not file a motion to suppress the evidence seized during the execution of the search warrants on Mitchell's apartment and the maroon van. Counsel's failure to file a motion to suppress does not necessarily constitute ineffective assistance of counsel. State v. Madrigal (2000), 87 Ohio St.3d 378, 389,721 N.E.2d 52. However, the failure to file a motion to suppress may constitute ineffective assistance of counsel when the record demonstrates that the motion would have been granted. State v.Conkright, 6th Dist. No. L-06-1107, 2007-Ohio-5315, at ¶ 50.
 {¶ 32} In this case, the record does not demonstrate that had counsel filed a motion to suppress, the trial court would have granted it.
 {¶ 33} R.C. 2933.22(A) provides, "[a] warrant of search or seizure shall issue only upon probable cause, supported by oath or affirmation particularly describing the place to be searched and the property and things to be seized."
 {¶ 34} When determining whether an affidavit submitted in support of a search warrant contains sufficient probable cause, the judge or magistrate is to make "a practical, common-sense decision" whether, given all the circumstances set forth in the affidavit, including the "veracity" and "basis of knowledge" of the persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. State v. George (1989),45 Ohio St.3d 325, 544 N.E.2d 640, at paragraph one of the syllabus (Illinois v. Gates [1983], 462 U.S. 213, 238-239, 103 S.Ct. 2317,76 L.Ed.2d 527 followed.)
 {¶ 35} At trial, Detective Jonathan Sowers testified regarding the *Page 7 
circumstances surrounding the warrants. He stated that he had been investigating appellant for several months. (Tr. 148). Detective Sowers received information regarding appellant from numerous sources such as people in jail, people who had been released from jail, and anonymous tips. (Tr. 149, 216). He stated that he corroborated the information he received. (Tr. 149). Detective Sowers stated that he received additional specific information from anonymous tips on February 21 and 22, 2006, that appellant had left Detroit and was headed back to Steubenville with a shipment of crack cocaine. (Tr. 149-50, 216). This information included a physical description of appellant and a description of the vehicle he would be driving. (Tr. 150-52). The information also included the address where appellant was headed, that being Mitchell's apartment. (Tr. 152). Detective Sowers verified all of this information. (Tr. 152, 216). He then observed appellant enter Mitchell's apartment on February 22. (Tr. 153). Based on all of this information and his observations, Detective Sowers obtained a search warrant for Mitchell's apartment. (Tr. 153, 216-17).
 {¶ 36} Additionally, after the search of Mitchell's apartment did not turn up the crack cocaine, Detective Sowers stated that a drug dog sniffed the vans in the driveway. (Tr. 171). The dog alerted the officers that it smelled a controlled substance. (Tr. 171). Based on the dog's alert and the previous information, the officers obtained a new warrant for the vans. (Tr. 171).
 {¶ 37} Given all of the above information, probable cause existed to support the issuance of the search warrants. Detective Sowers testified that he received information from numerous sources and he personally verified the information he received. Furthermore, the anonymous information given to police about appellant's trip from Detroit to Steubenville with the crack cocaine contained numerous details that Detective Sowers was able to corroborate. And when the search of the apartment did not turn up the suspected crack cocaine, the next logical place to look was the van appellant drove from Detroit. Before seeking a warrant to search the van, the police used a drug dog to sniff around the van. When the dog indicated that *Page 8 
it smelled a controlled substance, the police used this information, along with the other information, as probable cause for the warrant to search the van. Once a drug-sniffing dog indicates an odor of drugs, officers have probable cause to believe that drugs are present. SeeState v. Beavers, 8th Dist. No. 88513, 2007-Ohio-2915, at ¶ 13. Furthermore, appellant has pointed to no reason to believe that the drug dog was unreliable as he alleges.
 {¶ 38} Appellant also contends that his counsel was ineffective failing to make a proffer to the trial court regarding the search warrant. However, he does not elaborate on this assertion. Thus, it is unclear what he is alleging counsel should have done here.
 {¶ 39} Because the search warrants were supported by probable cause, counsel's decision not to file a motion to suppress did not constitute ineffective assistance of counsel. Accordingly, appellant's second assignment of error is without merit.
 {¶ 40} Appellant's third pro se assignment of error states:
 {¶ 41} "THE RECORD DOES NOT SUPPORT THAT EVERY ELEMENT OF POSSESSION OF CRACK COCAINE AND WEAPONS UNDER DISABILITY WAS PROVEN BEYOND A REASONABLE DOUBT."
 {¶ 42} Additionally, counsel's second and third assignments of error provide:
 {¶ 43} "THE JURY'S VERDICT FINDING APPELLANT GUILTY OF POSSESSION OF DRUGS, HAVING A WEAPON WHILE UNDER DISABILITY AND OF RECEIVING STOLEN PROPERTY WAS NOT AGAINST THE SUFFICIENCY OF THE EVIDENCE."
 {¶ 44} "THE JURY'S VERDICT FINDING APPELLANT GUILTY OF POSSESSION OF DRUGS, HAVING A WEAPON WHILE UNDER DISABILITY AND OF RECEIVING STOLEN PROPERTY WAS NOT AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 45} Appellant contends here that his convictions are against both the sufficiency and the weight of the evidence. *Page 9 
 {¶ 46} Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the jury verdict.State v. Smith (1997), 80 Ohio St.3d 89, 113, 684 N.E.2d 668. In essence, sufficiency is a test of adequacy. State v. Thompkins (1997),78 Ohio St.3d 380, 386, 678 N.E.2d 541. Whether the evidence is legally sufficient to sustain a verdict is a question of law. Id. In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Smith, 80 Ohio St.3d at 113.
 {¶ 47} The jury convicted appellant of possession of crack cocaine, having a weapon while under a disability, and receiving stolen property. We must examine the evidence presented to determine if all of the elements of the three crimes were met.
 {¶ 48} First, Detective Sowers testified. Detective Sowers stated that when he and the other officers executed the search warrant, they announced their presence and ran through the back door. (Tr. 155-56). He stated that appellant ran towards the front door. (Tr. 156). Appellant and Mitchell were the only people present. (Tr. 156). Detective Sowers stated Detective Hanlin took appellant and Mitchell outside while the officers conducted their search of the residence. (Tr. 156-57).
 {¶ 49} Once inside, Detective Sowers found a loaded Ruger 9mm semiautomatic pistol inside a kitchen cabinet lying inside a pie pan. (Tr. 158). He also located several men's jackets and boots in the hall closet, two tee shirts and a jacket in the laundry, and a pair of men's pants in the bedroom. (Tr. 161-64). Upon questioning, Mitchell indicated that several of these clothing items belonged to appellant and the others belonged to her. (Tr. 169-70). Additionally, Detective Sowers found shooting targets in the basement. (Tr. 165). Mitchell told officers that she did not know that the gun or the targets were in the apartment. (Tr. 169). Detective Sowers also found $400 in a purse in the closet. (Tr. 218). And his *Page 10 
partner found $416 on appellant's person. (Tr. 218).
 {¶ 50} Detective Sowers stated that once appellant was outside, he asked for his coat. (Tr. 157). Before handing appellant his coat, Detective Hanlin checked the pockets and removed a set of keys. (Tr. 157). The keys were to the maroon van. (Tr. 171). This set of keys was the only set to the maroon van the officers could locate. (Tr. 221). Mitchell's key ring did not contain keys for the maroon van. (Tr. 221). When Detective Sowers questioned Mitchell regarding who owned the maroon van, she stated that it was registered to her but that appellant was the only one who drove it. (Tr. 170, 198-99).
 {¶ 51} Once Detective Sowers found the gun in the kitchen cabinet, appellant was arrested for having a weapon while under a disability. (Tr. 167). He was taken to jail at that point. (Tr. 167). Detective Sowers identified a certified copy of appellant's conviction for drug trafficking, which he stated made it illegal for appellant to purchase a firearm. (Tr. 178). Detective Sowers later received information that the gun had been stolen from a house burglary in West Virginia. (Tr. 167). There was no evidence, however, that appellant was the one who stole the gun. (Tr. 198).
 {¶ 52} Detective Sowers further testified that upon searching the maroon van, which he had previously seen appellant driving, officers found 12 separate baggies of crack cocaine, each weighing approximately three grams. (Tr. 171, 173).
 {¶ 53} Marcie Mitchell testified next. She stated that appellant did not live with her but that he "stayed" with her every weekend and sometimes longer. (Tr. 238). She stated that he went back and forth between Detroit and Steubenville. (Tr. 238).
 {¶ 54} Regarding the maroon van, Mitchell stated that there was only one set of keys. (Tr. 247). She stated that appellant had been driving the maroon van on the day of the search. (Tr. 247).
 {¶ 55} Mitchell denied telling Detective Sowers that the shooting targets did not belong to her and testified that they were in fact hers. (Tr. 260-61). Mitchell testified that she has never owned a gun. (Tr. 265). However, she admitted that she hid a gun for appellant. (Tr. 265). The prosecution then played one of several *Page 11 
phone calls appellant made from jail to Mitchell. In the phone call, appellant argued with Mitchell because she did not give him the gun like he had asked her to do. (Tr. 272-73, 281). The phone conversation continued and appellant stated:
 {¶ 56} "Man, you wouldn't be — man, you wouldn't be going through this shit if you wouldn't have been acting ignorant, man. I told your ass about it. If you wouldn't have been acting like you was acting and gave me what I asked you for, maybe we wouldn't have to worry about this. The only thing I'd be worrying about is that shit they found in the van." (Tr. 276).
 {¶ 57} Mitchell then stated that the drugs found in the van were what appellant was referring to. (Tr. 276). In the phone call, appellant then stated: "The only thing is what you going to do, man, because I'll tell you what, I ain't taking that gun. So, it's up to you. I'll go — I'll go to trial for that shit." (Tr. 276). Mitchell stated that appellant wanted her to claim the gun. (Tr. 277). Appellant then stated on the phone: "The rest of that shit, that's me. You know what I'm saying (inaudible) that's mine." (Tr. 277).
 {¶ 58} Mitchell testified that appellant brought her a gun on February 17. (Tr. 282, 336). She stated that she placed that gun above the kitchen sink along with a bag of ammunition. (Tr. 289-90). But she stated the police did not find it in their search. (Tr. 289). However, she admitted that in her phone calls with appellant they never mentioned that there were two guns. (Tr. 290, 296). She stated that the gun the police found was not the gun appellant had given her. (Tr. 296). And when she was shown the gun that was seized from her apartment, Mitchell stated that it was not the same gun appellant had given her. (Tr. 355).
 {¶ 59} In another phone conversation with Mitchell, appellant stated that he had told some people, "I'm going to find out who snitching on me." (Tr. 301). And in a phone conversation with his mother, appellant again stated that he was going to find out who snitched on him. (Tr. 473).
 {¶ 60} Mitchell also identified the items seized from the maroon van as appellant's belongings. (Tr. 344-49, 391-94). *Page 12 
 {¶ 61} Additionally, Mitchell testified that the day of the raid, her cousin Shaheen had driven the maroon van and then returned it to appellant. (Tr. 357).
 {¶ 62} Next, Jeffery Houser testified. Houser works for the Ohio Bureau of Criminal Identification and Investigation (BCI) analyzing drug evidence. Houser testified that the substance submitted from the Steubenville police was crack cocaine and that in total it weighed 34.32 grams. (Tr. 409-410).
 {¶ 63} Detective Jason Hanlin testified next. Detective Hanlin assisted on the search at Mitchell's apartment. Detective Hanlin stated that he was there when Detective Sowers found the gun in the kitchen cabinet. (Tr. 420). He also stated that both he and Detective Sowers thoroughly searched all of the kitchen cabinets. (Tr. 421). Detective Hanlin stated that he did not think it was possible that they missed finding another gun as Mitchell had testified. (Tr. 422).
 {¶ 64} Detective Hanlin also testified that Mitchell stated to him that appellant drove the maroon van and that he had just returned home driving it a short time prior to the officers' arrival. (Tr. 426). Mitchell also told Detective Hanlin that appellant always drives the maroon van and that he was the one who made the payments on it. (Tr. 425-26). Detective Hanlin further testified that appellant requested his jacket when he went outside. (Tr. 428). Detective Hanlin stated that appellant pointed to his jacket, which had the keys to the maroon van in the pocket. (Tr. 428).
 {¶ 65} Detective Hanlin conducted the search of the maroon van. He stated that he found 12 small baggies containing a white rock substance inside a bigger bag on the floor between the two front, bucket seats. (Tr. 431). Detective Hanlin also testified that he found two jackets, boots, a picture of appellant wearing a stocking cap, the same stocking cap, a bowling ball bag marked "Big Dawg," which is appellant's nickname, and a set of golf clubs. (Tr. 430-32).
 {¶ 66} As to the gun, Detective Hanlin stated that Mitchell denied ever seeing the gun before and stated that she did not know where it came from. (Tr. 427).
 {¶ 67} Detective Hanlin further testified that the day before executing the warrant, he saw appellant exit the maroon van and enter Mitchell's apartment. (Tr. *Page 13 
433).
 {¶ 68} Several phone calls appellant made to his mother from jail were also played for the jury. In some of the phone calls, appellant complained to his mother that if Mitchell had given him back his gun, then he would not be in jail. (Tr. 443, 449-50, 453, 463). In another phone conversation, appellant and his mother had the following exchange:
 {¶ 69} "MRS. BASLEY: Well, what they — did you ask them what they searching for?
 {¶ 70} "MR. BARNETT: Yeah. I asked them. I said `What y'all looking for?'
 {¶ 71} "MRS. BASLEY: What did they say?
 {¶ 72} "MR. BARNETT: Drugs.
 {¶ 73} "MRS. BASLEY: Somebody called, Ray.
 {¶ 74} "MR. BARNETT: Yeah, I know somebody called. I wouldn't be surprised if the bitch did it.
 {¶ 75} "MRS. BASLEY: Who?
 {¶ 76} "MR. BARNETT: Kay.
 {¶ 77} "MRS. BASLEY: (Inaudible) see, that's — that's just it. You probably thinking the wrong person did.
 {¶ 78} "MR. BARNETT: Somebody called.
 {¶ 79} "MRS. BASLEY: (Inaudible) it could have been — you never can tell, Marcie might have told somebody and they might have called." (Tr. 452).
 {¶ 80} In another phone call to his mother at 11:33 a.m. the morning after he was arrested, appellant told his mother that there was crack in the van:
 {¶ 81} "MR. BARNETT: There ain't no marijuana. They told me
 {¶ 82} "MRS. BASLEY: Well, what was in the car?
 {¶ 83} "MR. BARNETT: There wasn't no weed in there, period.
 {¶ 84} "MRS. BASLEY: It was crack?
 {¶ 85} "MR. BARNETT: Yeah.
 {¶ 86} "MRS. BASLEY: Well, then that's — that's worse time. I know Marcie *Page 14 
said something about cocaine.
 {¶ 87} "MR. BARNETT: They talking about possession. I'm glad they didn't hit me with trafficking.
 {¶ 88} "MRS. BASLEY: You must not have had that much.
 {¶ 89} "MR. BARNETT: No. I know what was in there but they didn't have no reason to take no money, none of that." (Tr. 467-68).
 {¶ 90} Detective Hanlin testified that when appellant made these statements to his mother, he had not yet been charged with a drug offense, but was only in jail on the weapons charge. (Tr. 480-81). And appellant stated in a phone call to Mitchell that he did not go to court until 4:00 p.m. the day after he was arrested. (Tr. 275). Thus, when appellant told his mother that there was crack in the van, he had not yet been charged with a drug offense, yet he knew that there was crack in the van.
 {¶ 91} Officer Jeffrey Shimon also testified for the state. Officer Shimon was involved in the execution of the search warrant. He stated that as the officers came in the back door of the apartment, appellant tried to run out the front door. (Tr. 500). When appellant was arrested and was standing outside, two men were standing nearby. (Tr. 502). Officer Shimon stated he heard appellant tell the men that when he got out of jail he would be back to get them for snitching. (Tr. 502).
 {¶ 92} The parties also entered two stipulations. They stipulated that appellant had a previous conviction for trafficking in drugs. (Tr. 413-14). And they stipulated that at his arraignment, appellant stated that he lived with Mitchell at her home. (Tr. 414-15).
 {¶ 93} This evidence supported each of the elements of appellant's three charges.
 {¶ 94} Appellant's possession count was for an alleged violation of R.C. 2925.11(A)(C)(4)(e). R.C. 2925.11(A) provides that "[n]o person shall knowingly obtain, possess, or use a controlled substance." When the controlled substance is crack cocaine in an amount from 25 grams to less than 100 grams, then the offense *Page 15 
is a first-degree felony. R.C. 2925.11(C)(4)(e).
 {¶ 95} Here, the evidence demonstrated that appellant was the primary, if not the sole driver, of the maroon van. Both Detective Sowers and Detective Hanlin observed appellant driving the maroon van in the days before the raid. And Mitchell stated that appellant usually drove the maroon van. Additionally, many of appellant's belongings were found in the maroon van, including his clothes, golf clubs, and bowling ball bag. Furthermore, the only set of keys to the maroon van was located inside appellant's coat pocket.
 {¶ 96} In addition to demonstrating that appellant was the primary driver of the maroon van, that he had the sole set of keys to the van, and that his belongings were found in the van, the evidence also demonstrated that 34 grams of crack cocaine were found in the maroon van. And in a phone call to his mother, appellant stated that there was crack cocaine in the van and he knew how much there was. This evidence was sufficient to prove that appellant possessed the crack cocaine found in the maroon van.
 {¶ 97} Appellant's having a weapon while under disability charge was for an alleged violation of R.C. 2923.13(A)(3), which provides in relevant part: "[N]o person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply * * * [t]he person is under indictment for or has been convicted of any offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse."
 {¶ 98} The parties stipulated that appellant had a prior conviction for drug trafficking. Thus, the state only had to prove that appellant possessed a firearm. Detective Sowers and Detective Hanlin testified that they found a 9mm gun in the kitchen cabinet. And Mitchell testified that appellant had given her a gun the previous week, which she hid in a kitchen cabinet. While Mitchell stated that the gun appellant gave her was not the same gun the officers found, this goes to Mitchell's credibility and the weight of the evidence. Furthermore, the evidence established that while appellant did not reside at Mitchell's apartment on a full-time basis, he *Page 16 
resided there frequently. And in appellant's phone conversations, he admitted that he had a gun at Mitchell's apartment and asked Mitchell to claim it as her own. Thus, the state presented sufficient evidence that appellant possessed a firearm while under a disability.
 {¶ 99} Appellant's receiving stolen property charge was for an alleged violation of R.C. 2913.51(A), which provides: "No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense."
 {¶ 100} Detective Sowers testified that the gun he found in the kitchen cabinet was stolen from a house burglary in West Virginia. Additionally, Detective Sowers testified that because of appellant's previous drug conviction, appellant could not legally purchase a gun. Because appellant could not obtain a gun through any legal means, he would have reasonable cause to believe that the gun he obtained was stolen. Thus, the state presented evidence going to each of the elements of receiving stolen property.
 {¶ 101} Based on the above, the state presented evidence going to each and every element of the crimes charged and a rational trier of fact could have found the essential elements of the crimes proven beyond a reasonable doubt. Thus, appellant's convictions are supported by sufficient evidence.
 {¶ 102} Next, we must consider appellant's argument that his convictions were against the manifest weight of the evidence.
 {¶ 103} In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Thompkins,78 Ohio St.3d at 387. "Weight of the evidence concerns `the inclination of thegreater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'" Id. (Emphasis sic.) In making its determination, a reviewing court is *Page 17 
not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. Id. at 390.
 {¶ 104} Still, determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the facts.State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.
 {¶ 105} In analyzing whether appellant's convictions were against the manifest weight of the evidence, we must consider the evidence he presented in his defense along with the previously set out evidence.
 {¶ 106} In appellant's defense, he presented three witnesses. First, Michelle Snyder, a fingerprint analyst at BCI, testified that fingerprints submitted from the van and the apartment did not match appellant's fingerprints. (Tr. 524-34). Second, Jennifer Akbar, a DNA analyst at BCI, testified that a DNA swab from the 9mm gun did not match appellant's DNA. (Tr. 541). And Akbar stated that the swab submitted from the plastic bag containing the crack was not sufficient to make any DNA comparisons. (Tr. 544).
 {¶ 107} Finally, appellant took the stand. Appellant admitted that he sometimes resided at Mitchell's home. (Tr. 566). And he admitted that he drove the maroon van from Detroit to Steubenville a few days before the search. (Tr. 638-39).
 {¶ 108} Appellant stated that earlier on the day of the search, Mitchell's cousin Shaheen had borrowed the maroon van. (Tr. 573-74). Appellant stated that Shaheen dropped the van off to him and gave him the keys. (Tr. 574). Appellant stated that not only does he drive the maroon van, but Mitchell also drives it as do her friends. (Tr. 575, 586). Appellant identified some service papers in the van as belonging to him. (Tr. 576-77). And he identified the coats, golf clubs, and other items found in the van as belonging to him. (Tr. 600-602, 697-609). Appellant further stated that when the officers took him outside of the apartment, he asked for his coat. (Tr. 585). However, he stated that he was unsure whether the keys to the van were in his coat pocket or not. (Tr. 585).
 {¶ 109} Although appellant admitted that most of the items found in the *Page 18 
van belonged to him, he denied having any knowledge of the drugs that were found. (Tr. 604). He stated that he did not have any crack cocaine in the van. (Tr. 604). Appellant also testified that after Shaheen returned the van to him, he did not see any drugs inside the van. (Tr. 614).
 {¶ 110} Appellant also identified several of the clothing items in Mitchell's apartment as his. (Tr. 600-604).
 {¶ 111} Appellant stated that when he was first arrested between 7:30 and 8:00 p.m., the officers told him that he was being charged with having a weapon while under disability. (Tr. 587). He stated that he did not find out about the drug offense until the next day when he went to court at approximately 4:00 p.m. (Tr. 587-88). When asked about the phone conversation with his mother where they talked about there being cocaine in the van, appellant stated that his mother got this information from the news. (Tr. 604-605). Later in his testimony, appellant changed his story and stated that he learned of the drug charge against him before his phone conversation with his mother. (Tr. 645-46).
 {¶ 112} Appellant testified extensively about the gun. He stated that he brought Mitchell a gun on February 17, less than a week before the search, because Mitchell asked him for a gun for protection. (Tr. 588-89). Appellant stated that the gun he brought Mitchell was a 38 Special, not a 9mm. (Tr. 589-90). He testified that the gun found during the search was not the gun he had given to Mitchell. (Tr. 590, 594). Appellant stated that he bought the 38 Special on the streets but could not remember who he bought it from. (Tr. 595, 597). He admitted that the gun he bought could have been stolen. (Tr. 597).
 {¶ 113} After the first day of trial, appellant went back to jail and called his friend Kay. He talked to her about what happened in court. He talked about the gun and Mitchell. The gist of his statements was that there was only one gun at Mitchell's apartment and it was the gun he had brought there. (Tr. 688-89, 692-93, 708). He also told Kay that he bought the gun off of the streets and that it was likely "hot," as in stolen. (Tr. 712-13). *Page 19 
 {¶ 114} This additional evidence bolsters the state's case against appellant. Appellant admitted that he sometimes resided at Mitchell's apartment and that many of the clothing items found at her apartment belonged to him. He admitted that he gave Mitchell a gun, which he bought off the streets. And he stated in a phone call that the gun was likely stolen. Furthermore, although appellant denied that the drugs found in the van were his, he admitted that the other items in the van belonged to him. And he admitted that he drove the van on the day of the search and was the last person to drive it.
 {¶ 115} Furthermore, appellant knew about the crack cocaine that was in the van before he was charged with this offense. Appellant was initially only arrested for having a weapon while under disability. He was taken to jail on this charge before officers even searched the maroon van. In jail, he made several phone calls to his mother. In one of the calls, appellant admitted to his mother that there was crack in the van and he knew how much there was. However, appellant also later stated that he did not find out that he was charged with drug possession until 4:00 p.m. the next day when he went to court. Thus, when he admitted to his mother that there was crack in the van, he did not yet know that the police had actually found any drugs.
 {¶ 116} And in the phone calls with his mother and Mitchell, appellant talked extensively about the gun. He never stated that there might be two guns or that the police found the wrong gun. Instead, he attempted to persuade Mitchell to claim that the gun belonged to her so that he would not have to deal with that charge.
 {¶ 117} Appellant also incriminated himself during several of his phone calls when he discussed who could have called the police about him and when he talked about threatening two men who may have snitched on him.
 {¶ 118} Based on all of the above evidence, we cannot conclude that the jury lost its way in finding appellant guilty as charged. Instead, appellant's convictions are supported by the manifest weight of the evidence.
 {¶ 119} Accordingly, appellant's third assignment of error is without *Page 20 
merit.
 {¶ 120} Appellant's fourth pro se assignment of error states:
 {¶ 121} "THE ACCUMULATION OF ERRORS COMMITTED BY COUNSEL, THE STATE AND THE COURT DEPRIVED THE APPELLANT OF A FAIR TRIAL."
 {¶ 122} In addition, counsel's fourth assignment of error provides:
 {¶ 123} "APPELLANT RECEIVED EFFECTIVE LEGAL REPRESENTATION THROUGHOUT THE COURSE OF HIS CRIMINAL PROSECUTION."
 {¶ 124} Appellant contends here that he was denied a fair trial due to various errors by the prosecutor and his counsel.
 {¶ 125} "The cumulative error doctrine refers to a situation in which the existence of multiple errors, which may not individually require reversal, may violate a defendant's right to a fair trial. To affirm a conviction in spite of multiple errors, we must determine that the cumulative effect of the errors is harmless beyond a reasonable doubt. The errors may be considered harmless if there is overwhelming evidence of guilt, if Appellant's substantial rights were not affected, or if there are other indicia that the errors did not contribute to the conviction." (Internal citations omitted.) State v. Anderson, 7th Dist. No. 03-MA-252, 2006-Ohio-4618, at ¶ 80.
 {¶ 126} None of the alleged errors appellant brings up have merit.
 {¶ 127} First, appellant claims that it was error for the state to mention drug sales because this led the jury to believe that he was involved in drug trafficking instead of mere possession. The instances appellant refers to are when, during Detective Sowers's testimony, the state questioned him about the probable cause for the search warrant. This came after appellant's counsel cross-examined Detective Sowers about whether an anonymous tip was the only information he had for the search warrant. On re-direct, Detective Sowers testified that in addition to the anonymous tip, he had other information regarding appellant's drug activities in Steubenville. (Tr. 216). Thus, the state was merely attempting to clarify a point *Page 21 
brought up by appellant's counsel on cross-examination. It did not initially raise this issue in its direct examination of Detective Sowers. The state did not want to leave the jury with the impression that the only information it had for the search warrant was an anonymous tip. (See Tr. 205-215). Thus, the state did not err in bringing up the fact that appellant was involved in drug activity on re-direct examination.
 {¶ 128} Second, appellant claims the state should not have brought up details surrounding a 2003 shooting in which appellant was accused, but not convicted. However, the state did not elicit this testimony. During direct examination of Mitchell, the state played a phone call between appellant and Mitchell where appellant stated that someone had been "slandering his name." (Tr. 298-99). On cross-examination of Mitchell, appellant's counsel asked Mitchell what appellant meant by that. (Tr. 366). Mitchell stated that appellant was referring to "the shooting * * * from a couple years ago." (Tr. 366). Thus, Mitchell opened the door to questions about the prior shooting. And appellant's counsel later admitted that Mitchell spontaneously brought the subject of the shooting up and, therefore, the state was permitted to question her about it. (Tr. 404)
 {¶ 129} Third, appellant asserts the state should not have brought up a prior marijuana trafficking case. The prior marijuana case that appellant refers to here is his 2003 conviction for marijuana trafficking, which both parties stipulated to. (Tr. 413-14). The fact that appellant had a prior drug conviction was an element of the crime of having a weapon under disability, which the state had to prove. Thus, it was proper for the state to bring up this conviction.
 {¶ 130} Fourth, appellant claims his counsel should have reviewed the telephone conversations he made from prison and played tapes that helped his case. Appellant makes no further assertions here. There is no evidence that there were any tapes of appellant's phone calls that would have helped his case. When an allegation of ineffective assistance of counsel is based upon material that is not part of the record, the merits of the argument cannot be addressed. State v. Morales, 5th Dist. No. 2004 CA 68, 2005-Ohio-4714, at ¶ 70. *Page 22 
 {¶ 131} Fifth, appellant argues that the prosecutor listened to a conversation between him and his counsel and used this conversation to impeach him regarding a letter he asked his counsel to deliver to Mitchell. The portions of the transcript appellant cites to in support of this allegation are during the state's cross-examination of him where it played a phone conversation between appellant and his friend Kay that appellant made from jail the night after the first day of trial. (Tr. 684-91). In the conversation, appellant told Kay about a letter he gave to his counsel to give to Mitchell. (Tr. 690). Thus, the phone conversation where appellant refers to the letter was between appellant and Kay, not appellant and his counsel. Furthermore, all of appellant's phone conversations that were played for the jury were calls that appellant made from jail. At the beginning of each call, the operator informed appellant and the other party on the line that the call may be recorded. Thus, any conversations appellant had on the jail phone were not confidential, as he contends.
 {¶ 132} Sixth, appellant contends that the state and his counsel erred by allowing evidence that he allegedly threatened someone. The only evidence of this type was testimony that officers heard appellant threaten to "get" two people for snitching on him when he was arrested. This evidence, in conjunction with evidence of appellant questioning who could have snitched on him, was proper to show that appellant possessed the drugs in the van. It was not used to show that appellant was threatening or intimidating a witness as he alleges.
 {¶ 133} Finally, appellant asserts that his counsel should have sought to have the prosecutor removed from the case because she was biased against him. However, appellant points to no evidence of such a bias. Furthermore, appellant has failed to take into consideration that the prosecutor's job was to prosecute him.
 {¶ 134} In conclusion, none of the alleged errors appellant raises have merit. Thus, there can be no cumulative error. Accordingly, appellant's fourth assignment of error is without merit.
 {¶ 135} For the reasons stated above, the trial court's judgment is *Page 23 
hereby affirmed.
Vukovich, J., concurs.
 DeGenaro, J., concurs. *Page 1